Cite as 2026 Ark. 61

# SUPREME COURT OF ARKANSAS
No. CR–24–703

|  |  |  |  |
|---|---|---|---|
|  |  | **Opinion Delivered:** April 16, 2026 |
| ZACHARY HOLLY | | |
| | APPELLANT | |
| | | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. O4CR–13–1] |
| V. | | |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE BRAD KARREN, JUDGE |
| | | |
| | | <u>AFFIRMED</u>. |

**COURTNEY RAE HUDSON, Associate Justice**

Appellant Zachary Holly, who was convicted of capital murder, rape, kidnapping, and residential burglary and received the death penalty, appeals from the Benton County Circuit Court's denial of his petition for postconviction relief.  For reversal, Holly argues that (1) trial counsel was ineffective for failing to investigate and present evidence of the extensive sexual abuse Holly experienced as a child; (2) trial counsel was ineffective for failing to investigate, develop, and present evidence of Holly's fetal alcohol spectrum disorder (FASD) and its effect on his functioning and judgment; (3) trial counsel performed ineffectively by neglecting Holly's lack of a significant criminal history on the penalty phase verdict form; (4) trial counsel wrongly conceded Holly's guilt without his knowledge or consent; (5) trial counsel rendered ineffective assistance by failing to ensure that the jury found unanimously, and without a reasonable doubt, that Holly committed a specific type

of capital murder that satisfied a specific aggravating circumstance; and (6) Holly was prejudiced by the cumulative effect of trial counsel's multiple acts of deficient performance. We affirm.

On January 2, 2013, the State filed a criminal information charging Holly with the capital murder, kidnapping, and rape of a six-year-old neighbor girl, Minor Child (MC), on November 20, 2012. Holly was also charged with residential burglary. At the twelve-day jury trial in May 2015, the following evidence was presented in support of the charges:

> The victim, [MC], was a six-year-old girl that Holly and his wife Amanda often babysat while her mother, DesaRae Crouch, was at work. Both Holly and his wife had a key to the house where the victim lived. Holly confessed to entering the residence by an unlocked side door after [MC]'s mother had gone to sleep. He went to the child's room, woke her, picked her up, and carried her to a nearby vacant house. Holly stated that after removing the child's pants, he "tried to stick it in," meaning penetrate the victim's vagina with his penis. Holly recalled that he then tied the child's pants in a knot around her neck and twisted the pants until she stopped kicking.

*Holly v. State*, 2017 Ark. 201, at 2, 520 S.W.3d 677, 680. After strangling MC, Holly then dragged her by her hair and the pajama pants still wrapped around her neck into a closet, closed the closet door, and went home. Holly stated in his confession that he attempted to put his penis inside MC for approximately five minutes and that he killed her so that she would not tell anyone what he had done. The medical examiner testified that the cause of death was strangulation and that MC's vagina had been penetrated. Semen found on MC's pajama shirt matched Holly's DNA, and swabs of MC's vagina and rectum revealed semen that was consistent with Holly's DNA. After hearing the evidence, the jury convicted Holly of all charges. *Id.*

During the penalty phase of the trial, the State presented victim-impact testimony from MC's mother, grandmother, and kindergarten teacher. The defense called twelve mitigation witnesses and introduced more than six hundred pages of exhibits, primarily consisting of Department of Human Services (DHS), medical, and school records. The mitigation specialist, Karen Maus, testified that according to Holly's medical records, a group of individuals attacked him and jumped on his testicles when he was eight years old, resulting in the removal of one testicle and repair of the other. Maus stated that she discovered at least twenty-three different addresses for Holly when he lived in Bakersfield, California, as a child and that he attended nine different elementary schools there. Maus testified that Holly also attended multiple different schools after his family moved back to Northwest Arkansas when he was a teenager. Several of Holly's high-school teachers— Sheila Trinkle, Steven Johnson, and Annie Quinn—testified that Holly was in special-education classes, had a learning disability, and was a poor student.

Jana Davis, who was a DHS investigator in Kern County, California, described the family's history with DHS and Holly's abusive and traumatic childhood in Bakersfield. She testified about fifteen referrals of abuse and neglect involving Holly's family, including reports that Holly was eating out of the garbage when he was three years old; that his mother, Ginger Simmons, was addicted to methamphetamine; and that Holly was physically abused by Ginger; his older brother, Kenneth (Kenny) Keeton; and his stepfather, Joseph Blackmon. Davis also stated that when Holly was eight years old, he disclosed repeated incidents of sexual abuse by Kenny. Although the initial report mentioned oral and anal rapes, Holly stated in an interview that Kenny had "humped" him with their clothes on,

except for one occasion when they were naked. Davis testified that a detective substantiated the allegation; however, Holly would not cooperate with law enforcement, and the allegation was not pursued further. Joy Morris, a DHS investigator in Benton County, Arkansas, testified to additional reports of abuse and neglect beginning when Holly was thirteen years old—for example, Ginger regularly locked Holly out of the house, Holly appeared to be malnourished, and Ginger abused alcohol and drugs.

Christina Whitaker, Holly's stepaunt, testified that when Holly's family moved back to Arkansas, Ginger married Butch McCutcheon. Whitaker described McCutcheon as mean, violent, and angry and stated that he physically abused both Ginger and Holly. McCutcheon also used methamphetamine and marijuana in front of Holly, and Whitaker testified that on one occasion, McCutcheon injected methamphetamine in Holly's neck and made fun of him after Holly collapsed. Whitaker further stated that Ginger had confessed to her that she had prostituted herself and stolen items to support her drug habit when she lived in Bakersfield with her children.

Holly's ex-wife, Amanda, testified that she met Holly when he was thirteen or fourteen. She stated that Ginger "wasn't a good mom" and would smoke methamphetamine with Holly and Kenny. Amanda testified that she tutored Holly in high school and that she had to fill out job applications and tax forms for him when they were married because he could not read or write proficiently.

Holly's grandfather, Lonnie Guyll, testified that Ginger moved to California with Holly after he was born. Guyll stated that Ginger did not initially take Kenny because "she wasn't too stable back then, the men she stayed with and everything." However, Guyll

eventually sent Kenny to Bakersfield to live with Ginger when he was eight or nine years old. Kenny described Ginger's addiction to methamphetamine when he and Holly were children, and he confirmed that their stepfather, Blackmon, was physically abusive to them both. In addition, Kenny stated that McCutcheon taught Holly how to cook methamphetamine when Holly was fourteen or fifteen years old. Kenny testified that although Holly could read only at a third- or-fourth grade level, at best, before his arrest, he had taught himself how to read while awaiting trial. Benton County Sheriff's Deputy Randall Kelley testified that Holly had also saved another inmate's life by notifying him that the inmate was attempting to hang himself. Kelley stated that Holly had never been violent to him or to any of the other jailers.

Ginger was the final witness to testify on behalf of the defense. She explained that she left Kenny with her grandparents when she moved to California because she was "partying too much." She became addicted to methamphetamine soon after she moved, and she stated that the drug was more important to her than anything else, including her children, at that time. Ginger testified that she would trade food stamps and sexual favors for methamphetamine and that she had sold her children's Christmas presents for drug money. She stated that her ex-husband, Blackmon, is a registered sex offender and that he had been arrested for physically assaulting both her and her children. She admitted that DHS received multiple complaints about her neglect of Holly and that DHS had also investigated a claim that Kenny sexually abused Holly. Ginger further admitted that she got Holly "high" on marijuana when he was ten years old to keep him from telling on her and that she had used methamphetamine with him.

At the conclusion of the penalty phase, the jury unanimously found that three aggravating circumstances existed beyond a reasonable doubt: (1) the capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody; (2) the capital murder was committed in an especially cruel or depraved manner; and (3) the capital murder was committed against a victim whom the defendant knew or reasonably should have known was especially vulnerable to the attack because the victim was twelve years of age or younger. The defense presented forty-seven mitigating circumstances. The jury unanimously found that thirty of these mitigators probably existed, the majority of which had to do with the abuse and neglect that Holly suffered as a child. In addition, at least one juror found that nine more mitigators probably existed, including the sexual abuse of Holly as a child. At least one juror also listed under "Other mitigating circumstances" that Holly had been attacked when he was eight years old, resulting in the removal of a testicle and the repair of the other. The jury concluded that the aggravating circumstances outweighed beyond a reasonable doubt any mitigating circumstances found by any juror to exist and that the aggravating circumstances justified beyond a reasonable doubt a sentence of death for the capital murder. The jury also sentenced Holly to two life terms for the rape and the kidnapping and twenty years' imprisonment for the residential burglary. We affirmed Holly's convictions and sentences on direct appeal. *Holly*, *supra*.

Holly filed an Ark. R. Crim. P. 37 petition in May 2018 and was subsequently granted leave to file an amended petition and a second-amended petition. In his second amended petition filed on September 12, 2020, he raised multiple claims, six of which are at issue in this appeal. A hearing on the petition was held over eight days in October and

November 2023. Holly's trial counsel, Kent McLemore and Robby Golden, testified about their pretrial mitigation efforts and trial strategy. In addition to their investigation into Holly's educational background and the neglect and abuse he suffered as a child, which led to the mitigating evidence described above, counsel secured three different mental-health experts—Dr. Ashley Christiansen, Dr. Patricia Walz, and Dr. Robert Hanlon—to evaluate Holly prior to his trial. These experts testified at the hearing.

Dr. Christiansen, a clinical psychologist at the Arkansas State Hospital, examined Holly to determine his fitness to proceed and whether his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired when he committed the offense. Dr. Christiansen testified that, as part of her evaluation, she conducted psychological testing and interviewed Holly, Ginger, McLemore, and others. She diagnosed Holly with unspecified depressive disorder, reading disorder, amphetamine and cannabis dependence, and an unspecified personality disorder. Dr. Christiansen's testing revealed that Holly fell within the low-average range of intellectual functioning, but she did not find any significant impairment or neurocognitive or neurodevelopmental deficits. She concluded that Holly did not suffer from a mental disease or defect that impaired his capacity to appreciate the criminality of his conduct or conform his behavior to the requirements of the law.

Trial counsel then requested an independent examination by Dr. Walz, a neuropsychologist, to evaluate Holly's personality and cognitive functioning related to the criminal charges and to identify any relevant impairment. Dr. Walz testified that before issuing her report, she spoke with Holly's attorneys; reviewed the case file and Holly's

employment, educational, and medical records; interviewed Holly, Ginger, and Kenny; and conducted psychological testing. Her testing showed that Holly's IQ was in the low-average range, and she diagnosed Holly with an adjustment disorder with depressed mood; methamphetamine dependency; cannabis abuse; learning disorders in written expression, math, and reading; and an unspecified personality disorder.

McLemore testified that he discussed Dr. Christiansen's and Dr. Walz's reports with another forensic psychologist, Dr. Mark Cunningham, who did not raise any "red flags" that either of them had missed anything but recommended that McLemore seek another assessment by Dr. Hanlon, chief neuropsychologist and co-director of the forensic research lab at Northwestern University School of Medicine. McLemore testified that he did not restrain Dr. Hanlon's evaluation in any way, and Dr. Hanlon stated that he understood that trial counsel was interested in determining whether Holly had any form of brain dysfunction. Dr. Hanlon reviewed the records provided by trial counsel, including the prior evaluations by Drs. Christiansen and Walz, discussed the case with counsel, and conducted a seven-hour evaluation of Holly. Dr. Hanlon informed trial counsel after his examination that Holly did not put forth sufficient effort and had failed at least one performance-validity test. Dr. Hanlon was therefore unable to rule out malingering.

McLemore testified that after being advised that Dr. Hanlon's evaluation would not be helpful to Holly, trial counsel decided not to have him write a report that would then be discoverable by the prosecution. McLemore stated that they did not pursue another expert evaluation at that point because the trial was approaching, and they chose to focus their time and resources preparing for it. He and Golden testified that although Dr. Walz

8

was present and prepared to testify at trial, they decided not to call her as a witness after Ginger's testimony left the jury visibly emotional, with at least one juror in tears. Golden explained that Dr. Walz did not present well and that they made a strategic decision to rest their case with Ginger. McLemore further stated that they were concerned that if Dr. Walz testified, the prosecution would rebut that testimony by calling Dr. Christiansen, who had mentioned in her report that Holly was diagnosable as a pedophile if found guilty of the crimes.

Holly also presented testimony by expert witnesses who had examined him after his trial. Much of this testimony related to Holly's claim that trial counsel was ineffective by failing to investigate and present evidence of his FASD. Dr. Daniel Martell, a forensic neuropsychologist, performed tests to determine Holly's neurocognitive impairment. He testified that Holly was significantly impaired in six different areas: executive functioning; language functioning; academic skills involving reading, comprehension, math, and spelling; auditory attention; immediate working memory; and visuospatial/constructional abilities. Dr. Barry Crown, a neuropsychologist, testified that he also tested Holly for neuropsychological impairment. Dr. Crown concluded that Holly was impaired in the frontal and temporal areas of the brain affecting his reasoning, memory, judgment, and impulsivity. Dr. Natalie Novick Brown, a psychologist who specializes in FASD, testified that she was asked to perform a lifelong functional evaluation of Holly for suspected FASD and accompanying brain damage. She stated that FASD is equivalent to intellectual disability and impairs a person's executive functioning. She testified that Holly suffers from FASD, specifically, neurodevelopment disorder associated with prenatal alcohol exposure (ND-

PAE), and that it impaired his capacity to conform his conduct to the requirements of the law when the offenses were committed. Dr. Julian Davies, a pediatrician, testified that Holly has microcephaly, an abnormally small head, which Dr. Davies primarily attributed to fetal-alcohol exposure. He diagnosed Holly with alcohol-related neurodevelopment disorder, which he stated is equivalent to Dr. Brown's ND-PAE diagnosis.

Dr. Jonathan Lipman, a neuropharmacologist, also testified. He stated that he examined Holly to determine the effects of Holly's drug use on his neurological development. Dr. Lipman testified that Holly began using marijuana at age ten and methamphetamine at age thirteen and that his substance abuse impaired his brain development, particularly the frontal lobe, and his emotional regulation. Finally, Dr. Lisak, a clinical psychologist, testified that he was consulted as an expert in the effects of childhood trauma. Dr. Lisak stated that Holly's youngest brother, Joey, disclosed that Kenny had sexually abused him and that he had also witnessed Kenny's sexual and physical abuse of Holly. Dr. Lisak testified that the abuse Holly had suffered taught him that it was normal to sexually abuse younger people and increased the likelihood that he would later engage in violent behavior.

Dr. Hanlon testified in response to Holly's experts. He disagreed with their choice of which psychological tests to use and their interpretation of certain test results, and he stated that some of these tests did not take into consideration Holly's underlying reading disorder. Dr. Hanlon testified that the fact that Holly's IQ had increased thirteen points since his childhood was also "markedly inconsistent with a neuropsychological disorder." While Dr. Hanlon did not challenge Dr. Brown's diagnosis of FASD, he noted that she had

10

relied on the testing by Drs. Martell and Crown, which he described as "highly suspect." According to Dr. Hanlon, the primary factor in any neuropsychological dysfunction suffered by Holly was his chronic methamphetamine use.

The parties submitted posthearing briefs following the Rule 37 hearing. The circuit court then entered an order on July 9, 2024, denying Holly's second amended petition. Holly filed a timely notice of appeal from the circuit court's order, and he challenges the circuit court's denial of six of his claims.[1]

The circuit court's denial of a Rule 37 petition will not be reversed unless the court's findings are clearly erroneous. *Roos v. State*, 2019 Ark. 360, 588 S.W.3d 738. A finding is clearly erroneous when, although there is evidence to support it, the appellate court after reviewing the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Lane*, *supra*. We have also held that the credibility of witnesses is a question for the trier of fact in Rule 37 proceedings. *Tornavacca v. State*, 2012 Ark. 224, 408 S.W.3d 727.

The benchmark for judging a claim of ineffective assistance of counsel, as derived from *Strickland v. Washington*, 466 U.S. 668 (1984), is whether counsel's conduct so undermined the proper functioning of the adversarial process that the proceeding cannot be relied upon as having produced a just result. *Roos*, *supra*. Pursuant to *Strickland*, we assess the effectiveness of counsel under a two-prong standard. First, a petitioner raising a claim of ineffective assistance must show that counsel made errors so serious that counsel was not

---

[1]The claims raised below that Holly does not reassert on appeal are deemed abandoned. *Lane v. State*, 2019 Ark. 5, 564 S.W.3d 524.

functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment to the United States Constitution. *Woods v. State*, 2019 Ark. 62, 567 S.W.3d 494. In other words, the petitioner must show that his counsel's performance fell below an objective standard of reasonableness. *Id*. A court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Smith v. State*, 2020 Ark. 410. The burden is on the petitioner to overcome this presumption and to identify specific acts and omissions by counsel that could not have been the result of reasoned professional judgment. *Id*. Conclusory statements that counsel was ineffective cannot be the basis for postconviction relief. *Roos, supra.*

Second, the petitioner must show that counsel's deficient performance prejudiced the petitioner's defense. *Rasul v. State*, 2015 Ark. 118, 458 S.W.3d 772. The petitioner must show that there is a reasonable probability that, but for counsel's errors, the fact-finder would have had a reasonable doubt respecting guilt, i.e., the decision reached would have been different absent the errors. *Id*. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Smith, supra.* Unless a petitioner can satisfy both prongs of the *Strickland* standard, it cannot be said that the conviction resulted from a breakdown in the adversarial process that renders the result unreliable. *Roos, supra.*

The constitutional guarantee of effective assistance of counsel extends to the sentencing phase of the trial. *Johnson v. State*, 2020 Ark. 168, 598 S.W.3d 515. Trial counsel's failure to investigate and present substantial mitigating evidence during the sentencing phase of a capital-murder trial can constitute ineffective assistance. *Id*. To demonstrate prejudice, the petitioner is required to establish that there was a reasonable probability that, had counsel

performed further investigation and presented the witness or witnesses, the outcome of the trial would have been different. *Reams v. State*, 2018 Ark. 324, 560 S.W.3d 441.

I. *Whether Trial Counsel Was Ineffective for Failing to Investigate and Present Evidence of Sexual Abuse*

Holly first argues that the circuit court erred by denying his claim that trial counsel was ineffective for failing to investigate and present evidence during the sentencing phase of the trial about the extensive sexual abuse that Holly experienced as a child. Although he admits that some evidence of his sexual abuse was introduced through Jana Davis, the DHS worker, Holly claims that Davis testified that the report was unsubstantiated and that trial counsel did not ask Kenny about the abuse. Holly argues that the prosecution capitalized on the lack of corroboration for the abuse in its closing argument and that, as a result, the jury did not unanimously find that this mitigating factor probably existed. He contends that trial counsel should have presented other available evidence of the sexual abuse, such as Joey's testimony and expert testimony, to help the jury understand how the abuse affected Holly's ability to function as an adult.

McLemore testified that he discussed with Ginger and Holly the sexual abuse referenced in the DHS records. Ginger denied that the abuse occurred, and Holly did not want counsel to present that issue to the jury. McLemore reminded Holly that he had mentioned the abuse in his confession and informed him that it was counsel's duty to present mitigating evidence. McLemore explained that counsel did not ask Kenny about the sexual abuse because he was a valuable mitigation witness and that they were afraid he would not cooperate if he was confronted about it. Trial counsel further testified that they had interviewed Joey, although he never mentioned the sexual abuse by Kenny, and that they

13

intended to call him as a mitigation witness. However, when they spoke with Joey again prior to trial, he was in prison for exposing other men to HIV and was heavily tattooed. Trial counsel decided not to have him testify at that point because they did not believe he would be a credible witness.

We hold that trial counsel was not deficient for failing to investigate or present additional evidence of the sexual abuse. Whether to call a particular witness, including an expert witness, is largely a matter of professional judgment and is trial strategy that is outside the purview of Rule 37. *Barefield v. State*, 2024 Ark. 141, 696 S.W.3d 822; *Johnson, supra.* "The fact that there was a witness or witnesses who could have offered beneficial testimony is not, in itself, proof of counsel's ineffectiveness." *Johnson*, 2020 Ark. at 7, 598 S.W.3d at 520. Evidence that Kenny sexually abused Holly was presented to the jury through the DHS records, Davis's testimony about those records, and Holly's confession. While Holly claims that the allegation was unsubstantiated, Davis testified that it had been substantiated by law enforcement and that it was not pursued further because Holly refused to cooperate. Given that the evidence was already before the jury, trial counsel's decision not to elicit further testimony regarding the sexual abuse, whether through Kenny, Joey, or an expert witness like Dr. Lisak, was entirely reasonable. Thus, the circuit court did not clearly err by denying this claim of ineffective assistance.

## II. Whether Trial Counsel Was Ineffective for Failing to Investigate and Present Evidence of FASD

Holly next contends that trial counsel's performance was ineffective because counsel failed to investigate, develop, and present evidence of Holly's FASD and its effect on his functioning and judgment. He argues that trial counsel's failure to have him tested for FASD

14

was deficient performance given all of the "red flags" that should have put them on notice of the need to investigate this disorder. Specifically, Holly points to his mother's admission to drinking while pregnant, his developmental delays, his low birth weight and growth deficiency, and other secondary disabilities that are common in people with FASD, such as mental-health problems, school disruption, substance abuse, employment problems, dependent living, and inappropriate sexual behavior. Holly claims that trial counsel failed to understand or educate themselves about FASD, and as a result, they failed to specifically request that their experts evaluate him for FASD or ensure that they retained an expert who was qualified to diagnose it. Holly contends that he was prejudiced by counsel's deficient performance because, if evidence of his FASD diagnosis had been presented, it would have supported the statutory mitigator that he committed the murder while his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect. *See* Ark. Code Ann. § 5-4-605(3). According to Holly, if that mitigator had been met, it is reasonably probable that at least one juror would have voted for life instead of death.

We cannot say that the circuit court clearly erred by rejecting this ineffective-assistance claim. During an interview with the prosecutor before trial, Ginger initially denied drinking while pregnant with Holly. While she later admitted to trial counsel that she drank alcohol until she learned that she was pregnant with Holly, it was not until her interviews with the experts that Holly retained for purposes of postconviction proceedings that Ginger disclosed that she regularly drank throughout her pregnancy. McLemore testified that, based on the information they had prior to trial, "[w]e never viewed evidence of fetal alcohol

15

syndrome as especially strong. In fact, it seemed to be equivocal in this particular case[.]" Nonetheless, he stated that it is "inconceivable" that he would not have discussed possible prenatal alcohol and drug use with their retained experts and that he did not limit the experts' evaluations in any way.

Trial counsel had Holly evaluated by three separate psychologists, Drs. Christiansen, Walz, and Hanlon. After Dr. Christiansen concluded that Holly did not suffer from any substantial impairment, trial counsel sought a second opinion and consulted Dr. Walz, a neuropsychologist. Dr. Walz claimed that she did not remember trial counsel mentioning the issue of prenatal alcohol prior to her evaluation. However, the circuit court found McLemore's testimony on this issue to be more credible, and we defer to the circuit court's credibility determinations. *Tornavacca*, *supra*. Ginger did disclose to Dr. Walz that she had used "poppers" a few times during her pregnancy.[2] Dr. Walz found no areas of significant impairment in Holly's cognitive functioning, with the exception of his verbal fluency. Trial counsel then consulted with a forensic psychologist, Dr. Cunningham, who did not raise any "red flags" that either Dr. Christiansen or Dr. Walz missed something but nonetheless recommended that Holly be assessed by Dr. Hanlon, another neuropsychologist. Golden testified that they retained Dr. Hanlon to explore the possibility of organic brain damage, and McLemore stated that they discussed with Dr. Hanlon the possibility of "in utero disturbances" based on Ginger's drug and alcohol use. As noted earlier, however, Dr. Hanlon was unable to rule out malingering due to Holly's insufficient effort during testing,

---

[2]"Poppers" are a nickname for amyl nitrate, a vasodilator.

and trial counsel instructed Dr. Hanlon not to write a report that would have to be disclosed to the prosecution.

It was reasonable for trial counsel to rely on the opinions of their experts. When counsel has obtained the assistance of a qualified expert on the issue of the defendant's mental health, and nothing has happened that should have alerted counsel to any reason why the expert's advice was inadequate, counsel has no obligation to shop for a better opinion. *Marcrum v. Luebbers*, 509 F.3d 489 (8th Cir. 2007). The fact that a later expert renders an opinion that would have been more helpful to the defendant's case does not show that counsel was ineffective for failing to find and present that expert. *Id*. While Holly argues that the experts retained by his trial counsel were not qualified to diagnose FASD, none of the experts informed counsel that this was the case. Dr. Brown, Holly's expert, agreed that most psychologists are inadequately trained on FASD and often miss that diagnosis. Dr. Brown stated that although counsel has a responsibility to convey information about known prenatal alcohol exposure to an expert, the expert also has an obligation to disclose whether he or she has expertise in that area. The circuit court credited McLemore's testimony that he did, in fact, discuss this issue with their experts. Furthermore, even if neither Dr. Christiansen nor Dr. Walz was qualified to diagnosis FASD, Holly presented no evidence that Dr. Hanlon was not. In fact, the circuit court concluded that he was so qualified. Accordingly, we affirm the circuit court's denial of Holly's claim that trial counsel was ineffective for failing to investigate, develop, and present evidence of FASD.

III. *Whether Trial Counsel Was Ineffective by Failing to Include the Lack-of-Significant-Criminal-History Mitigator*

17

For his third point, Holly argues that trial counsel's performance was ineffective because he neglected to include Holly's lack of significant criminal history on the penalty-phase verdict form. He claims that he was entitled to this statutory mitigator because he had no criminal history as an adult, and "his juvenile contacts with the law reflect the chaos and trauma that defined his childhood." Holly contends that trial counsel's oversight prejudiced him because his limited criminal history would have shown the jury that the crime was an "aberration" and that he was likely to serve a life sentence peaceably and cooperatively.

Both trial counsel testified at the hearing that they intended to include the lack of significant criminal history as a statutory mitigator pursuant to Ark. Code Ann. § 5-4-605(6) and that their failure to do so was an oversight. As the circuit court concluded, however, Holly cannot demonstrate prejudice from this omission. The jury unanimously found that three aggravating circumstances existed beyond a reasonable doubt, and out of forty-seven mitigators, the jury unanimously found that thirty probably existed and that ten more probably existed. Holly has failed to show that the addition of one more mitigator related to his lack of significant criminal history would have altered the outcome of his sentencing. We therefore affirm the circuit court's denial of this claim.

IV. *Whether Trial Counsel Wrongly Conceded Holly's Guilt*

Holly next contends that trial counsel wrongly conceded his guilt at trial without his knowledge or consent. He claims that counsel usurped his authority under the Sixth and Fourteenth Amendments to decide whether to admit guilt or maintain innocence and deprived him of his fundamental right to hold the State to its burden of proof. Citing *McCoy*

*v. Louisiana*, 584 U.S. 414 (2018), Holly argues that this deprivation amounts to a structural error and that no demonstration of prejudice is required.

Holly entered a plea of not guilty to the charges, and the statement of the case that was read at the beginning of voir dire indicated that Holly denied committed the crimes. During opening statements ten days later, however, counsel conceded that Holly had removed the victim from her home, had sexual contact with her, and caused her death. McLemore testified that shortly before the trial, Holly agreed to proffer a guilty plea to the State in order to avoid the death penalty. Although the plea was rejected, McLemore believed that this would also be a good mitigator to submit during sentencing to show that Holly accepted responsibility for his actions. He testified that, while he did not discuss with Holly his plan to admit guilt during opening statements, he did not believe that he needed permission based on Holly's agreement to the guilty-plea proffer. McLemore and Golden further noted that Holly did not object to their strategy at any point.

In *Florida v. Nixon*, 543 U.S. 175 (2004), the Supreme Court held that trial counsel's failure to obtain the defendant's express consent to the strategy of conceding guilt during the guilt phase of the trial does not automatically render counsel's performance ineffective. The Court stated that counsel had informed the defendant of the proposed strategy and its potential benefits and that the defendant's silence did not suffice to render unreasonable counsel's decision to concede guilt and focus on the possibility of a death sentence. *Id*. In *McCoy*, *supra*, however, the Court reversed and remanded for a new trial where counsel, despite the defendant's express objection at every opportunity both before and during trial, conceded guilt in a capital case. The Court held that counsel's actions violated the

defendant's "Sixth Amendment-secured autonomy" to decide the objective of his defense. *Id.* at 427. The Court further concluded that the error was structural and did not require the defendant to show prejudice. *Id.* at 426.

We hold that the facts in this case are clearly distinguishable from those in *McCoy*. The defendant in *McCoy* strenuously and consistently objected to counsel's strategy of admitting guilt. Here, however, Holly agreed to proffer a guilty plea shortly before trial began, and trial counsel believed that they had his permission to concede guilt in an attempt to avoid the death penalty. Holly also did not object once this strategy became clear. Thus, the situation in this case more closely resembles that in *Nixon*, *supra*, which was analyzed under the traditional *Strickland* framework. To the extent that Holly is making a separate *Strickland* claim, he cannot show that trial counsel's performance was objectively deficient. Counsel's decision to concede Holly's guilt was intended to gain credibility with the jury during the sentencing phase of the trial and was purely strategic. As the Court in *Nixon* stated, "[a]ttorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear[,]" and "[i]n such cases 'avoiding execution [may be] the best and only realistic result possible.'" *Nixon*, 543 U.S. at 191 (quoting *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* § 10.9.1 cmt. (rev. ed. 2003), *reprinted in* 31 Hofstra L. Rev. 913, 1040 (2003)). "Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared." *Id.* Counsel's strategy in this case was reasonable given the overwhelming evidence of Holly's

guilt, specifically, his confession to the crimes and the DNA evidence. We therefore affirm the circuit court's denial of this claim.

## V. *Whether Trial Counsel Was Ineffective by Failing to Request Nonmodel Verdict Forms*

Holly argues in his fifth point on appeal that trial counsel rendered ineffective assistance by failing to ensure that the jury found unanimously and beyond a reasonable doubt that Holly committed a specific type of capital murder that satisfied a specific aggravating circumstance. He contends that he was charged with four different crimes that constitute capital murder but that the verdict form used in this case required only a general finding of guilty or not guilty. He therefore claims that the jury never reached a unanimous verdict on any of the four different crimes and that this violated his Sixth, Eighth, and Fourteenth Amendment rights. Holly further argues that the penalty-phase verdict suffered from the same infirmity because the State asserted that the jury could find any of five different definitions of the aggravator that the murder was committed in an especially cruel or depraved manner. According to Holly, counsel's failure to object to the general verdict forms amounted to structural error that does not require a demonstration of prejudice.[3] Even if the error was not structural, Holly claims that he was prejudiced by counsel's failure because the jury may not have agreed on which type of capital murder was committed or which subfinition of the aggravator applied in this case.

---

[3]Holly's structural–error argument regarding the guilt-phase verdict form is not preserved for appellate review because he did not raise it in his Rule 37 petition. *E.g.*, *Van Winkle v. State*, 2016 Ark. 98, 486 S.W.3d 778. Thus, we address that issue only under the *Strickland* standard.

In determining whether a nonmodel verdict form should have been submitted, we use the same standard that we apply when considering whether a nonmodel jury instruction was warranted. *Perry v. State*, 2014 Ark. 535, 453 S.W.3d 650. A nonmodel verdict form should be given only when the model verdict form does not accurately state the law or there is not a verdict form covering the offense. *Ortega v. State*, 2016 Ark. 372, 501 S.W.3d 824. We have held that model verdict forms are presumed correct and that the party challenging the model form must rebut the presumption of correctness. *E.g.*, *Kinsey v. State*, 2016 Ark. 393, 503 S.W.3d 772.

## A. Model-Verdict Form for Capital Murder

The State charged Holly under four alternative theories of capital murder: (1) felony murder based on rape; (2) felony murder based on kidnapping; (3) intentional-and-premeditated murder; or (4) knowingly causing the death of someone fourteen years of age or younger under circumstances manifesting extreme indifference to the value of human life. *See* Ark. Code Ann. § 5-10-101(a)(1)(A)(ii)–(iii), (a)(4), (a)(9) (Supp. 2011). At the conclusion of the guilt phase of the trial, the circuit court instructed the jury on these alternative theories and submitted the defense's requested model-verdict form for capital murder, which stated, "We, the jury, find Zachary Holly guilty of capital murder." *See* AMI Crim. 2d 8301-VF. The jury was also instructed that the State had to prove each element of the charged offense beyond a reasonable doubt and that all twelve of the jurors had to agree on the verdict. During closing arguments, the State told the jury that, even though the evidence supported Holly's guilt on all four alternative means of committing capital murder, it only had to find him guilty of one to convict him.

22

While Holly is correct that jury unanimity is required to convict a defendant of a serious crime, *Ramos v. United States*, 590 U.S. 83 (2020), neither this court nor the United States Supreme Court has held that when a defendant is charged with alternative means of committing a single count of an offense, the jury is required to agree upon a single means of commission. *See, e.g.*, *Torres v. State*, 2019 Ark. 101, 571 S.W.3d 456 (explaining that a general verdict submitted under factual alternative bases may be upheld provided that at least one of the charged alternatives is supported by sufficient evidence) (citing *Griffin v. United States*, 502 U.S. 46 (1991)); *Terry v. State*, 371 Ark. 50, 263 S.W.3d 528 (2007) (reviewing a capital-murder conviction charged under both capital-felony murder and premeditated-and-deliberated murder and holding that the general guilty verdict would be upheld because there was sufficient evidence to support capital-felony murder). Holly cites *Sheppard v. State*, 120 Ark. 160, 179 S.W. 168 (1915), to support his contention that the alternative formulations of capital murder in this case were themselves different crimes requiring separate verdicts. However, the issue in *Sheppard* was whether the defendant could be charged with one type of first-degree murder and convicted of another type, when each type required different elements. That case did not involve the use of general verdict forms, and it is not applicable here.

Holly has not demonstrated that the general verdict form in this case was prohibited under either state or federal precedent. Because the model verdict form correctly stated the law, trial counsel was not deficient for failing to request a nonmodel verdict form. *E.g.*, *Douglas v. State*, 2019 Ark. 57, 567 S.W.3d 483. Accordingly, the circuit court did not clearly err by rejecting this claim.

### B. Model–Verdict Form for Aggravating Circumstances

Holly also challenges trial counsel's failure to request a nonmodel verdict form for the statutory aggravating circumstance that the murder was committed in an especially cruel or depraved manner. Ark. Code Ann. § 5-4-604(8) (Repl. 2006). Consistent with the statute, the verdict form used in this case stated:

> Capital murder is committed in an especially cruel manner when, as part of a course of conduct intended to inflict mental anguish, serious physical abuse, or torture upon the victim prior to the victim's death, mental anguish, serious physical abuse, or torture is inflicted. Mental anguish is defined as the victim's uncertainty as to her ultimate fate. Serious physical abuse is defined as physical abuse that creates a substantial risk of death or that causes protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ. Torture is defined as the infliction of extreme physical pain for a prolonged period of time prior to the victim's death.

> A capital murder is committed in an especially depraved manner when the defendant relishes the murder, evidencing debasement or perversion, or shows an indifference to the suffering of the victim and evidences a sense of pleasure in committing the murder.

Although Holly contends that the jury was never required to unanimously find at least one specific subdefinition beyond a reasonable doubt, the jury was instructed to determine whether this aggravating circumstance existed beyond a reasonable doubt. As with the capital-murder verdict form, he has not cited any authority to support his claim that this model verdict form failed to correctly reflect existing law. Thus, Holly has not demonstrated either structural error or trial counsel's ineffectiveness for failing to request a nonmodel verdict form for this aggravating circumstance; therefore, the circuit did not clearly err by denying this claim.

### VI. *Cumulative Error*

Finally, Holly argues that he is entitled to postconviction relief because the cumulative effect of counsel's errors denied him a fair trial, even if we conclude that no single claim justifies relief. As Holly admits, however, we have consistently held that we do not recognize cumulative error in allegations of ineffective assistance of counsel. *E.g.*, *Whiteside v. State*, 2024 Ark. 30, 684 S.W.3d 588; *Howard v. State*, 367 Ark. 18, 238 S.W.3d 24 (2006). While Holly contends that our precedent conflicts with *Strickland*, we have previously rejected this argument as well. *E.g.*, *Echols v. State*, 354 Ark. 530, 127 S.W.3d 486 (2003). We therefore affirm the circuit court's denial of Holly's Rule 37 petition.

Affirmed.

Special Justice TIFFANY BROWN joins.

BRONNI, J., not participating.

*Short Law Firm*, by: *Lee D. Short*; and *James Law Firm*, by: *William O. "Bill" James, Jr.*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Brooke Jackson Gasaway*, Ass't Att'y Gen., and *Walker K. Hawkins*, Ass't Att'y Gen., for appellee.